John Lynn Smith (SBN 154657)
(E-Mail: jlsmith@reedsmith.com)
Eric M. McLaughlin (SBN 200867)
(E-Mail: emclaughlin@reedsmith.com)
REED SMITH LLP
Two Embarcadero Center, Suite 2000
San Francisco, CA  94111-3922

**Mailing Address:**
P.O. Box 7936
San Francisco, CA  94120-7936

Telephone:    (415) 543-8700
Facsimile:    (415) 391-8269

Attorneys for Defendant
REDWOOD LANDFILL, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NORTHERN CALIFORNIA RIVER WATCH, a non-profit Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>WASTE MANAGEMENT INC., REDWOOD LANDFILL INC. and DOES 1-10, inclusive,<br><br>Defendants. | No.: C-07-5058 WHA<br><br>**DEFENDANT REDWOOD LANDFILL, INC.'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT**<br><br>Date:          December 20, 2007<br>Time:          8:00 a.m.<br>Place:         Courtroom 9, 19th Floor<br>Compl. Filed: October 1, 2007<br>Trial Date:    None Set<br><br>Honorable William Alsup |

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................................1

II. ARGUMENT .............................................................................................................................2

    A. The Notice Fails To Provide Sufficient Information To Allow Redwood To Identify The Activity Allegedly Constituting A Violation Of Discharging Pollutants From A Point Source Without A NPDES Permit....................2

        1. References to the Monitoring Reports in the Notice do not Satisfy the Required Specificity........................................................................................3

        2. The Law does not Support River Watch's Reliance on the Monitoring Reports. ...................................................................................4

    B. The Notice Fails To Provide Sufficient Information To Allow Redwood To Identify The Location Of The Alleged Discharges Of Pollutants From A Point Source Without A NPDES Permit.................................................................6

    C. The Notice Fails To Provide Sufficient Information To Permit Redwood To Identify The Dates Of Point Source Discharges Made Without An NPDES Permit. ........................................................................................................8

    D. The Notice Fails To Provide Sufficient Information To Allow Redwood To Identify The Activity Allegedly Constituting The Violation Of The General Permit. ...............................................................................................................9

    E. The Notice Fails To Provide Sufficient Information To Allow Redwood To Identify The Location Of The Alleged Violations Of The General Permit..................................................................................................................12

    F. The Notice Fails To Provide Sufficient Information To Allow Redwood To Identify The Dates Of The Alleged Violations Of The General Permit.................12

III. CONCLUSION........................................................................................................................14

# TABLE OF AUTHORITIES

## CASES

*San Francisco BayKeeper, Inc. v. Tosco Corp.*
   309 F.3d 1153 (9th Cir. 2002) ................................................................................5, 8, 12, 13

*Friends of Frederick Seig Grove #4 v. Sonoma County Water Agency*
   124 F. Supp. 2d 1161 (NDCA 2000) ...................................................................................6, 7

*California Sportfishing Protection Alliance v. City of West Sacramento*
   905 F.Supp. 792 (EDCA 1995) ........................................................................................8, 9, 13

*Kokkonen v. Guardian Life Insurance Co. of America*
   511 U.S. 375 (1994) .................................................................................................................6

*National Resources Defense Council v. Southwest Marine, Inc.*
   945 F.Supp. 1330 (SDCA 1996) .............................................................................................8

*Nat'l Resources Defense Council v. Southwest Marine, Inc.*
   236 F.3d at 1007 .................................................................................................................8, 11

*Stock West, Inc. v. Confederated Tribes*
   873 F.2d 1221 (9th Cir. 1989) .................................................................................................6

## STATUTES

33 U.S.C. 1318(b) .........................................................................................................................9

33 U.S.C. § 1362(14) ...............................................................................................................6, 12

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Defendant Redwood Landfill, Inc. ("Redwood") submits this reply memorandum of points and authorities in support of its motion to dismiss the complaint.

## I.     INTRODUCTION

Plaintiff Northern California River Watch's ("River Watch") opposition brief fails to establish that River Watch's Clean Water Act Notice ("Notice") provided sufficient information to satisfy the legal and factual requirements of a citizen's suit notice under the Clean Water Act. In fact, River Watch's opposition brief ("Opposition") tacitly admits the existence of such deficiencies by, among other things, recasting the applicable law to improperly shift the burden of establishing subject matter jurisdiction to Redwood, intentionally misinterpreting the information provided in the monitoring reports referenced in the Notice as evidence of Redwood's pollutant discharges, and diverting the Court's attention away from the fundamental issue of whether the Notice was legally and factually sufficient by raising completely irrelevant issues, such as the substance of confidential discussions that occurred after the Notice was received by Redwood. (*See* Declaration of Andrew M. Kenefick in Support of Defendant Redwood Landfill, Inc.'s Motion to Dismiss, ¶ 4-8.)

Notwithstanding River Watch's belated attempts through its Opposition to rehabilitate the legal and factual sufficiency of the Notice, fatal deficiencies remain because the Notice fails to provide even the bare minimum of detail sufficient to inform Redwood of the alleged Clean Water Act violations so that Redwood can determine how to remedy those alleged violations. Specifically, the Notice fails to allege the activity, location and date of the alleged pollutant discharges without a National Pollution Discharge Elimination System ("NPDES") permit and the alleged violations of the General Industrial Storm Water Permit ("General Permit") with the requisite reasonable specificity that would allow Redwood to identify and, if necessary, remedy those violations. Because the Notice fails to satisfy the legal and factual requirements of a citizen's suit notice under the Clean Water Act, the Court should dismiss River Watch's complaint based on lack of subject matter jurisdiction.

## II. ARGUMENT

**A. The Notice Fails To Provide Sufficient Information To Allow Redwood To Identify The Activity Allegedly Constituting A Violation Of Discharging Pollutants From A Point Source Without A NPDES Permit**

Contrary to River Watch's assertions, its Notice does not provide sufficient information to allow Redwood to identify the activity allegedly constituting pollutant discharges from a point source without a NPDES Permit ("NPDES Activity"). Indeed, the Notice simply states that "[d]ue to the hydrological connection between the waste disposal site and waters of the United States, point source discharges occur every day, as evidenced by the groundwater monitoring results referenced above." (Exhibit A to River Watch's Complaint ("Notice") at 6.) River Watch's overly general and vague allegations fail to provide any information that sufficiently describes NPDES Activity, such as landfilling, compacting or dust abatement, and the monitoring reports referenced in the Notice ("Monitoring Reports") contain no evidence of any discharge to the groundwater or the waters of the United States. Without more detailed information regarding the type of conduct that constitutes the NPDES Activity or the constituents allegedly discharged at point sources by such activity, Redwood is left to speculate as to if, when, how or where it allegedly violated its NPDES Permit and, as such, has been deprived of the opportunity to remedy the alleged violation.

River Watch also argues that the Notice adequately describes the NPDES Activity by discussing the "questionable adequacy" of Redwood's leachate collection and removal system ("LCRS"). (Opposition at 7:9-16.) However, the discussion regarding the "questionable adequacy" of the LCRS in the Notice is based merely on "concerns," "doubts" and speculation regarding the LCRS' effectiveness to contain landfill leachate on site. Absent is any reliable evidence that the LCRS is in fact failing, and consequently, violating the Clean Water Act. (Notice at 3.) In short, it is argument, not information. Moreover, River Watch's claim that it suggested engineering fixes for the alleged LCRS problem cannot cure a defective Clean Water Act notice, because the proposed

solutions, such as a perimeter berm or securing a part of a retaining wall, underscore the very generalized nature of River Watch's allegations. Further, any concerns, doubts or speculations regarding the effectiveness of the LCRS are eliminated by River Watch's own admission in the Notice that Waste Discharge Requirement Order #95-110 describes the leachate collection pond as "lined" to prevent any leakage. (Notice at 3.) Additionally, as mentioned in Redwood's motion to dismiss, the term "leachate" is used generally to refer to liquid that has contacted solid waste in a landfill, and can contain a wide variety of substances, not all of which would be deemed a pollutant under the Clean Water Act. Such substances can emanate from sources other than a landfill, including naturally-occurring sources. Without more specific information evidencing the alleged failure of the LCRS resulting in a violation of the Clean Water Act or the constituents allegedly discharged at point sources, Redwood is left to speculate regarding the nature of any NPDES Activity and whether it violated its NPDES Permit.

### 1. References to the Monitoring Reports in the Notice do not Satisfy the Required Specificity.

River Watch attempts to cure its factually deficient Notice by referencing Monitoring Reports in the Notice that it claims evidence violations of a water quality standard. Although River Watch argues that the Monitoring Reports evidence discharges of pollutants into the groundwater in excess of reportable limits and therefore discharges to surface water in violation of the Clean Water Act, the Monitoring Reports provide no such evidence. To the contrary, the Monitoring Reports generally and consistently find that no volatile organic compounds were detected at concentrations at or above the reporting limit in any groundwater monitoring wells, and find that inorganic results were generally within historic concentration ranges. (*See, e.g.*, Exhibit 1 to Declaration of Mark Verwiel ("Verwiel Decl.") ("Annual Monitoring Report 2005"), § 2.3.) The Notice does cite instances where various volatile organic compounds and inorganic compounds, such as ammonia, iron, acetone and carbon disulfide, were detected by the Monitoring Reports at levels in excess of reportable limits. (Notice at 4.) However, the Monitoring Reports and resampling reports referenced

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

in the Notice further state that the presence of ammonia, iron, acetone and carbon disulfide at levels in excess of reportable limits is not due to any discharge by Redwood, but rather other causes not under Redwood's control. (Annual Monitoring Report 2005, § 4.3.1; Exhibit 2 to Verwiel Decl. ("Annual Monitoring Report 2006"), § 4.2; Exhibit 3 to Verwiel Decl. ("First Semiannual Monitoring Report 2006"), § 4.1; Exhibit 4 to Verwiel Decl. ("Annual Monitoring Report 2004"), §§ 4.1, 4.3.); Exhibit 5 to Verwiel Decl. ("Resampling First Semiannual Monitoring Report 2006").) For example, iron and ammonia have been determined to occur naturally in regional concentrations, acetone is a common lab and field contaminant and is rarely verified in resampling activities, and carbon disulfide detections result from natural or biogenic activity. (*Id.*) Further, the San Francisco Bay Regional Water Quality Control Board ("RWQCB") has accepted these explanations, as evidenced by the fact that the Redwood Landfill ("Landfill") is in full compliance with all the permits issued by RWQCB. Additionally, the Landfill's Waste Discharge Requirements recognize that groundwater quality is naturally poor throughout the region as a result of high mineralization and saline water influences, and thus elevated quantities of the constituents identified in the Notice are not indicative of the Landfill's impacts on water quality. Thus, the Monitoring Reports do not provide any basis for concluding that Redwood produced point source discharges into the groundwater because such reports do not provide any evidence of any discharges of pollutants into the groundwater by Redwood, let alone discharges that exceeded permitted limits. Nor can the Monitoring Reports be used to demonstrate a point source discharge of pollutants into the navigable waters of the United States – a necessary prerequisite to a valid Clean Water Act notice.

**2.     The Law does not Support River Watch's Reliance on the Monitoring Reports.**

River Watch's argument that "citizen suit Notice letters have been deemed adequate which direct the recipient to familiar activities and to regulations and records which contain information sufficient to identify the nature, date and location of the activity alleged to constitute a violation" does not accurately characterize the generalized references to Monitoring Reports in its Notice, and thus, cannot cure River Watch's defective Notice. (Opposition at 6:16-18.) In an effort to provide

some authority for its argument, River Watch cites the following passage from *San Francisco BayKeeper, Inc. v. Tosco Corp.* ("*Tosco*"):

> We hold that BayKeeper's allegation that coke spilled into the slough each day of ship loading – even on days for which BayKeeper did not provide specific dates – was sufficiently specific to fulfill its notice obligation. Tosco is obviously in a better position than BayKeeper to identify the dates, or additional dates, of its own ship loading. The notice regulation does not require Bay Keeper in such a situation to provide the exact dates of alleged violations; rather it requires only that BayKeeper provide sufficient information to permit the recipient to identify the date or dates. (309 F.3d 1153, 1158-9 (9th Cir. 2002).)

But, River Watch neglects to identify other passages in the opinion that led the court in *Tosco* to arrive at its conclusion, and which distinguish *Tosco* from this case. Specifically, directly following the passage quoted above, the court in *Tosco* states: "Given the knowledge that Tosco already had, BayKeeper's letter was specific enough to notify Tosco of the nature of the alleged violations, as well as the likely dates of those violations." (*Id.* at 1159.) The "knowledge" the court in *Tosco* is referring to is based on the specific allegations in the *Tosco* notice that Tosco stored coke in large uncovered piles at Tosco's loading dock and that Tosco discharged coke during ship loading, and Tosco's own records of when Tosco's business-related activities occurred (*i.e.*, when coke stored on the dock was loaded onto ships). (*See id.* at 1156, 1158-9.) Such knowledge on the part of Tosco enabled the court in *Tosco* to rule that Tosco was "obviously in a better position than BayKeeper to identify the dates [of the alleged violations]," and rule that the *Tosco* notice was sufficient to notify Tosco of the nature of the alleged violations. (*See id.*)

Unlike *Tosco*, River Watch does not provide nearly as detailed of a description of the nature, date and location of the activity constituting the alleged violations. In part for the reason discussed above, mere reference to the Monitoring Reports is not the equivalent to the "knowledge" defendants had in *Tosco*. Further, regarding the nature of the activity allegedly constituting the violation of discharging from a point source without a NPDES permit, River Watch simply states "[d]ue to the hydrological connection between the waste disposal site and waters of the United States, point source discharges occur every day, as evidenced by the groundwater monitoring results referenced above."

(Notice at 6.) This statement simply raises unsupported doubts, concerns and speculation regarding the efficacy of the LCRS based on Monitoring Reports that do not provide any evidence of the time, date or existence of an unlawful discharge. (See § A.1, above.) Further, unlike *Tosco*, Redwood would not and does not keep any "business-related" records regarding discharges of pollutants into the groundwater as it is not in the business of producing such discharges. Presenting the *Tosco* case in a piecemeal fashion is simply an attempt by River Watch to recast, through misinterpretation, the law presented in *Tosco* in order to improperly shift the burden of establishing subject matter jurisdiction to Redwood.[1]

### B. The Notice Fails To Provide Sufficient Information To Allow Redwood To Identify The Location Of The Alleged Discharges Of Pollutants From A Point Source Without A NPDES Permit.

The Notice does not provide the required information to allow Redwood to identify the "location" of the alleged discharges of pollutants from a point source without a NPDES permit. After erroneously identifying all 600-plus acres of the Landfill as a "point source"[2], River Watch reverts to its fall-back position -- that "[t]he groundwater monitoring reports referenced [in the Notice] identify by number the specific wells where the samples were taken, thereby informing [Redwood] of locations where pollutants are released from the landfill into groundwater which then migrate to adjacent surface water." (Opposition at 9:5-7.) In support of this argument, River Watch quotes *Friends of Frederick Seig Grove #4 v. Sonoma County Water Agency* ("*Friends*"):

> When the plaintiff has gathered the information supporting its suit

---

[1] River Watch, as the party invoking the jurisdiction of this Court, has the burden of establishing jurisdiction. *See Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994). In fact, the court presumes lack of jurisdiction until the plaintiff establishes otherwise. *See id.*; *see also Stock West, Inc. v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir. 1989).

[2] The entire landfill is not considered a "point source" under the Clean Water Act, which defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

|   |   |
|---|---|
| 1 | from the defendant's own submissions to the relevant state agencies and cites those submissions in the notice letter, the plaintiff has satisfied the notice requirement, and a district court possesses subject mater jurisdiction over the case. (124 F. Supp. 2d 1161, 1169 (NDCA 2000).) |

*Friends*, however, is distinguishable from this case because, unlike the "submissions" that were referenced in the *Friends* notice, the Monitoring Reports prepared by Redwood and referenced in the Notice do not evidence any violations of the Clean Water Act – the *Friends* notice contained at least 326 violations, which were also listed in the *Friends* notice. The Monitoring Reports, however, do not evidence discharges of pollutants from a point source in excess of reportable limits. (See § 1.A, above.) Nor do they evidence any discharge of pollutants from a point source to a navigable water of the United States. To the contrary, the Monitoring Reports generally and consistently support the fact that no volatile organic compounds were detected at concentrations at or above the reporting limit in any groundwater monitoring wells and find that inorganic results were generally within historic concentrations ranges. (*See e.g.*, Annual Monitoring Report 2005, § 2.3.) The violations alleged by River Watch in the Notice by reference to the Monitoring Reports simply do not exist nor could any such violations be pinpointed by reference to the Monitoring Reports. Rather, the fact remains that the Notice fails to state where, even generally, the alleged discharges of pollutants originate in or exit from the Landfill. Notably, the Landfill property consists of over 600 acres of land and 32 storm water drainage points on the property. Finding that the Notice is sufficient to comply with the Clean Water Act notice regulation, in the face of overly general and vague allegations regarding the identity of the alleged point source discharges constituting violations of the Clean Water Act and the fact that the Monitoring Reports do not evidence any violations of the Clean Water Act, would violate one of the primary purposes of the Clean Water Act notice by effectively depriving Redwood of the opportunity to properly identify the alleged Clean Water Act violations, not to mention the opportunity to remedy such violations.

### C. The Notice Fails To Provide Sufficient Information To Permit Redwood To Identify The Dates Of Point Source Discharges Made Without An NPDES Permit.

The Notice does not contain specific information to permit Redwood to identify the "dates" of the alleged point source discharges made without an NPDES permit. River Watch argues that "the Ninth Circuit has determined when deficiencies are ongoing, no specific date need be alleged." (Opposition at 9:22-3.) But, River Watch's quotation of *Tosco* in support of its position is unconvincing. "Where BayKeeper alleged an ongoing violation of Tosco's obligation to implement best available technology to prevent storm water pollution, no specific dates were needed." (309 F.3d at 1153, 1158 (*quoting Nat'l Resources Defense Council v. Southwest Marine, Inc.*, 236 F.3d 985, 996 (9th Cir. 2000) ("*Southwest II*")).) River Watch misinterprets the above passage as applying to all types of Clean Water Act violations. There are generally two types of Clean Water Act violations: omission violations and commission violations. (*See Nat'l Resources Defense Council v. Southwest Marine, Inc.*, 945 F.Supp. 1330, 1332-3 (SDCA 1996) ("*Southwest I*"); *California Sportfishing Protection Alliance v. City of West Sacramento*, 905 F.Supp. 792, 799 (EDCA 1995) ("*CSPA*").) CWA notices alleging omission violations, such as the failure to implement best available technology, do not have to allege any specific dates those violations occurred. (*Southwest I*, 945 F.Supp. at 1333.) On the other hand, commission violations, such as the discharge of pollutants from a point source as claimed by River Watch, must, at a minimum, provide a range of dates that is reasonably limited. (*CSPA*, 905 F.Supp. at 799-800.) Here, the Notice generally identifies a five-year period from February 6, 2002 to February 6, 2007 as the time period during which the alleged point source discharges without an NPDES permit occurred. No additional specificity is even remotely provided. This is the type of lack of reasonable specificity the Court in *CSPA* identified as inadequate to meet the standards of the Clean Water Act notice regulation. (*Id.*)

The court in *CSPA* stated the following regarding the specificity required by the Clean Water Act notice regulation:

> [T]he date or dates of the violation must be stated with some specificity. Ideally plaintiff will identify the precise date. But at the least plaintiff should give a range as to date that is reasonably limited.
> (*Id.* at 799.)

The court in *CSPA* found that the *CSPA* notice's general allegation that "[f]or the previous five years on hundreds of occasions you have violated your NPDES permit" failed to provide the specificity required by the Clean Water Act notice regulation. (*Id.* at 800.) The Notice's vague and general reference to a five year period during which violations allegedly occurred is virtually identical to the *CSPA* notice's vague and general allegation regarding dates of alleged violations. Thus, the Notice is legally and factually defective because it does not provide a date range that is reasonably limited, and, as a result, the Court should dismiss this case based on of lack of subject matter jurisdiction.

**D.      The Notice Fails To Provide Sufficient Information To Allow Redwood To Identify The Activity Allegedly Constituting The Violation Of The General Permit.**

The Notice does not provide sufficient information to allow Redwood to identify the activity allegedly constituting the violation of California's General Industrial Storm Water Permit ("General Permit"). In its Opposition, River Watch states that the Notice provides a factual statement for each and every activity River Watch believed to be a violation of the General Permit:

> Information available to River Watch indicates that Redwood has not fully developed and/or adequately implemented a SWPPP for its combined operation as evidenced by the fact that Redwood has failed to eliminate non-stormwater discharges from its landfill operation. For example, total suspended solids and specific conductivity in the stormwater exceed EPA benchmarks, indicating a failure to use Best Management Practices…The General Permit prohibits the discharge of storm water to surface groundwater that adversely impacts human health or the environment. Redwood's discharges contain metals, solvents, organics, toxins and nutrients including nitrogen, phosphate and ammonia which adversely impact the environment including the jurisdictional adjacent wetlands, San Antonio Creek and the Petaluma River. (Opposition at 12:2-10.)

However, reading the entirety of the Opposition in conjunction with the Notice and the applicable law reveals that these "factual statements" are outright false, do not provide sufficient information to allow Redwood to identify the activity allegedly constituting the violation of the General Permit, or

are simply argument.

Specifically, River Watch readily admits that it has not reviewed Redwoods' SWPPP, although River Watch could have accessed Redwood's SWPPP by way of 33 U.S.C. 1318(b) prior to issuing its Notice. (Opposition 1:12-13.) How can River Watch be so sure that Redwood has failed to fully develop or adequately implement its SWPPP if River Watch has not even seen Redwood's SWPPP? Further, River Watch erroneously claims that "Redwood has failed to eliminate non-stormwater discharges from its landfill operation [as exemplified by the] total suspended solids and specific conductivity in the stormwater [that] exceed EPA benchmarks, indicating a failure to use Best Management Practices." (Notice at 5.) As noted in the Redwood's motion to dismiss, even if a generalized reference to "EPA benchmarks" were sufficiently specific, the exceedance of a benchmark is not a violation of a "standard or limitation" under Section 505(a)(1) of the Clean Water Act. (*See* Final Reissuance of NPDES for Industrial Activities, 65 Fed. Reg. 64746, 64816 (Oct. 30, 2000) ("The results of benchmark monitoring are primarily for your use to determine the overall effectiveness of your SWPPP in controlling the discharge of pollutants to receiving waters. Benchmark values, included in Part 6 of this permit, are not viewed as effluent limitations.").) Additionally, River Watch also alleges that "Redwood's [stormwater] discharges contain metals, solvents, organics, toxins and nutrients including nitrogen, phosphate and ammonia which adversely impact the environment including the jurisdictional adjacent wetlands, San Antonio Creek and the Petaluma River." (Notice at 5.) These overly general and vague references to the discharge of "solvents," "toxins," and "organics," "metals," and other nutrients fail to identify the compounds or the type of activity that allegedly released such constituents.[3] Without more specific information regarding the constituents that are generally listed in the Notice as constituents in storm water discharges and the activity that caused the discharge, Redwood is left without sufficient information to identify and resolve the alleged Clean Water Act violations. Further, contrary to River Watch's

---

[3] As mentioned in the discussion regarding the Monitoring Reports (§ A.1, above), Redwood has no confirmed sampling data showing discharges of materials that might even arguably fall into these overly broad categories.

assertions, Redwood has developed a SWPPP and monitors the Landfill through the inspection and monitoring program described in the General Permit. As allowed in the General Permit, the facility utilizes storm water discharge sample analysis to continually evaluate best management practices for purposes of pollution prevention. There is no evidence whatsoever indicating that Redwood has failed to adequately develop or implement its SWPPP.

Moreover, River Watch's Opposition identifies *Southwest I* as a case that is directly on point with regard to the specificity required for noticing omission violations under the Clean Water Act, such as the failure to develop and implement a SWPPP, and claims that the Notice provides as much information as the notice in *Southwest I*. (Opposition 11:16-19; 12:17-13:17.) However, River Watch virtually concedes that the Notice does not contain as much information as the notice in *Southwest I*: "Arguably the one respect in which River Watch's Notice was less specific than that of plaintiff NRDC was that River Watch did not provide specific deficiencies in defendant's Stormwater Pollution Prevention Plan." (Opposition at 13:6-8.) The *Southwest I* notice provided specific deficiencies in the SWPPP by providing detailed descriptions of the sections of the General Permit that were violated. For example, "listing pollutants likely to be present in stormwater in significant quantities and estimating the annual quantities of these pollutants, Section A.4.d." (*Southwest II*, 236 F.3d at 1007.) No part of the Notice describes the activity constituting the alleged omission violations with the type of specificity the *Southwest I* notice provided. Rather, the Notice simply provides overly general, vague and incomprehensible allegations regarding the activity constituting the alleged omission violations. For example, the Notice provides the following allegation as an example of Redwood's failure to develop and implement its SWPPP: "[t]otal suspended solids and specific conductivity in the stormwater exceed EPA benchjmarcks (sic), indicating a failure to utilize Best Management Practices." (Notice at 5.) Statements like this that allege a general failure (*i.e.*, failure to utilize Best Management Practices) do not provide the specificity exemplified by the *Southwest I* notice and required by law. Thus, the court should find that the Notice is inadequate and dismiss this case based on lack of subject matter jurisdiction.

### E. The Notice Fails To Provide Sufficient Information To Allow Redwood To Identify The Location Of The Alleged Violations Of The General Permit.

As mentioned in Section D, above, the alleged factual statements that allegedly describe each and every violation of the General Permit are either unsupported or outright false. Thus, there is no basis for River Watch to assert that the location of such violations is "the Landfill generally" as River Watch has failed to adequately describe any alleged violations of the General Permit. Moreover, in spite of River Watch's argument, the entire landfill is not considered a "point source" under the Clean Water Act, which defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362 (14). Rather than generally wave at the entire landfill as a "point source," River Watch must identify those point sources that are discharging pollutants into navigable waters of the United States in violation of the Clean Water Act.

### F. The Notice Fails To Provide Sufficient Information To Allow Redwood To Identify The Dates Of The Alleged Violations Of The General Permit.

River Watch's Notice fails to provide sufficient information to allow Redwood to identify the "dates" of the alleged discharges constituting violations of the General Permit. Rather, the Notice merely alleges that "[s]ince the beginning of operations, Redwood discharged stormwater containing pollutants and non-stormwater pollutants from its landfill site into adjacent wetlands, San Antonio Creek and/or their tributaries, in violation of the General Permit, during at least every rain event over 1 inch as measured by the National Oceanographic and Atmospheric Administration." (Notice at 5.) River Watch argues that this allegation is sufficient to meet the standards of the Clean Water Act notice regulation because the notice in *Tosco* provided similar allegations regarding the dates of discharges resulting from rain coming into contact with uncovered coke piles. (Opposition at 14:11-

21.) However, the notice in *Tosco* listed 190 dates between 1994 and 1999 when the San Francisco Bay received more than one-tenth of an inch of rain as dates on which rain came into contact with uncovered coke piles and then carried contaminants directly into the water. (*Tosco*, 309 F.3d at 1156.) Taking into account that the Landfill has been operating since at least 1958, the date range in the Notice is significantly greater than the date range listed in the *Tosco* notice. Needless to say, a range of almost 50 years is not reasonably limited as required by the Clean Water Act, and does not meet the standards outlined in the Clean Water Act notice regulation. *See CSPA*, 905 F.Supp. at 799-800.)

Additionally, *Tosco* can be distinguished from this case because, as River Watch admits, one of the reasons the court in *Tosco* found that the notice in *Tosco* was sufficient as to the dates of the stormwater violations, even though its allegations regarding the dates of the violations were vague, was that the *Tosco* notice specifically described the particular problem of coke piles subject to discharge in stormwater. (Opposition at 15:5-9.) As discussed, the Monitoring Reports do not evidence any type of discharges of pollutants. (See § A.1, above.) Further, the overly general list of constituents River Watch says are contained in alleged discharges fails to provide sufficient information to allow Redwood to identify and correct the activity allegedly violating the Clean Water Act. (Notice at 5.) Because the Notice does not adequately describe the activity allegedly violating the Clean Water Act, the same relaxed standard applied to the *Tosco* notice regarding the adequacy of information concerning the dates of the violations should not be applied to the Notice, especially when such vague dates are paired up with the lack of specificity as to alleged pollutants and discharge locations. If the relaxed *Tosco* standard is not applied, the Notice fails to adequately describe the dates on which the violations of the Clean Water Act took place and fails to provide enough information for Redwood to identify and correct such violations, if any existed. This requirement is not some minor technicality for pleading a complaint, rather it is an issue of fundamental fairness to any defendant who wants to understand and, if valid, correct a purported violation of the Clean Water Act. In this case, that is not possible. Thus, the Notice should be deemed not to meet the requirements of the CWA notice regulation, and, accordingly, the court

should dismiss this case based on lack of subject matter jurisdiction.

### III. CONCLUSION

The Notice merely provides overly general, vague and sometimes incoherent information about alleged violations, and continuously references monitoring reports that do not stand for the factual propositions River Watch claims they do. Not surprisingly, Redwood is left guessing at the nature, location and dates of the alleged Clean Water Act Violations. The notice requirements under the Clean Water Act require notices to provide adequate information to allow an alleged wrongdoer a reasonable opportunity to identify and remedy the alleged violation. The Notice does not provide such an opportunity to Redwood. Thus, the Notice does not satisfy the notice requirements under the Clean Water Act and, as a result, the Court should dismiss this case based on lack of subject matter jurisdiction.

DATED: December 5, 2007

        REED SMITH LLP

        By   /s/
           John Lynn Smith
           Eric M. McLaughlin
           Attorneys for Defendant
           REDWOOD LANDFILL INC.